UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL E. KEELING,                        :
                                           :
            Plaintiff                      :     No. 4:CV-11-0365
                                           :
      vs.                                  :     (Judge Nealon)
                                           :           **FILED**
                                           :           **SCRANTON**
C.O. BARRAGER, et al.,                     :
                                           :           APR 0 3 2014
            Defendants                      :
                                           :     _____
                             **MEMORANDUM**      PER _____ DEPUTY CLERK

## Background

On February 25, 2011, Michael E. Keeling, an inmate confined in the State Correctional

Institution, Dallas ("SCI-Dallas"), Pennsylvania, filed the above captioned civil rights action

pursuant to 42 U.S.C. § 1983. The action proceeds via an amended complaint. See (Doc. 23,

amended complaint). Keeling names as Defendants Dr. Jane Jesse, SCI-Dallas psychiatrist[1],

Department of Corrections Secretary John Wetzel, and the following employees of SCI-Dallas:

Acting Unit Manager Cicerchia, Hearing Examiner McKeown, Corrections Officers Barrager,

Walsh, Mooney, Zakarauskas, Pall, Cirelli, Lucas and Martin. Id. He raises claims of retaliation,

denial of due process, and denial of access to the courts. Id. For relief, he seeks compensatory and

punitive damages. Id.

Presently pending is the Corrections Defendants' motion to dismiss the complaint. (Doc.

47). The motion is fully briefed and is ripe for disposition. For the reasons set forth below, the

motion to dismiss will be granted.

───────────────────

1.    Dr. Jesse is represented by separate counsel and has a separate motion for summary judgment
pending. See (Doc. 35).

**Discussion**

I.  **Standard of Review**

 **Motion to Dismiss**

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for the dismissal of

complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual]

allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

them in the light most favorable to the plaintiff." Kanter v. Barella, 489 F.3d 170, 177 (3d Cir.

2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)). Although the court is

generally limited in its review to the facts contained in the complaint, it "may also consider matters

of public record, orders, exhibits attached to the complaint and items appearing in the record of the

case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); see

also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

 Federal notice and pleading rules require the complaint to provide "the defendant notice of

what the ... claim is and the grounds upon which it rests." Phillips v. Cty. of Allegheny, 515 F.3d

224, 232 (3d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test

the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a

three-step inquiry. See Santiago v. Warminster Twp., 629 F.3d 121, 130–31 (3d Cir. 2010). In the

first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id.

(quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (1009)). Next, the factual and legal elements of a

claim should be separated, well-pleaded facts must be accepted as true, while mere legal

conclusions may be disregarded. Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11

(3d Cir. 2009).  Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679, citing Twombly, 550 U .S. at 555-56 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level").  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

When the complaint fails to present a prima facie case of liability, however, courts should generally grant leave to amend before dismissing a complaint. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116–17 (3d Cir. 2000). "[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips, 515 F.3d at 245 (citation omitted).  The federal rules allow for liberal amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962) (citations and internal quotations omitted).

## II.   Allegations in Complaint

Plaintiff's amended complaint revolves around his displeasure with the removal of his Z-Code single cell status, having to accept a cell mate, the termination of his psychotropic medication, and use the general population medication line. (Doc. 23, Amended Complaint at ¶¶ 1-50).  Plaintiff levels the majority of these allegations again Dr. Jesse, who is not a party to the instant motion to dismiss.  He also claims that these acts were all done in retaliation for the filing of Keeling v. Dameter, Civil Action No. 09-cv-0147, a civil action in which Dr. Jesse was a named Defendant. (Doc. 23, Amended Complaint at ¶¶ 1-50).

3

The remainder of Plaintiff's amended complaint alleges that the remaining Defendants engaged in episodes of retaliation against him in terms of prison housing decisions and misconducts, acts of retaliation that were allegedly based upon a lawsuit and grievances Plaintiff filed against Defendants. See id. at ¶¶ 51-211. Because Plaintiff's amended complaint encompasses twenty-nine (29) pages and 211 paragraphs of allegations, the Court will dispense with addressing the allegations seriatim and will address Plaintiff's allegations as they pertain to the individual Defendants.

### A.   Claims against Defendant Barrager

Plaintiff states that on January 13, 2010, Defendant Barrager , while "assigned to A-Block and collecting inmate's commissary slips for next weeks commissary", called Plaintiff "Mr. Grievance" in front of another inmate. (Doc. 23, amended complaint at ¶¶51, 52). Plaintiff claims that his "commissary slip was not turned in on January 13, 2010, because C.O. Barrager collected it but did not turn it in for processing." Id. at ¶ 53.

On January 28, 2010, Plaintiff claims that Defendant Barrager "deliberately filed bogus (retaliatory) DC-141 No. 725218 against Plaintiff alleging: threatening an employee or family member with bodily harm and abusive language to an employee." Id. at ¶55. Plaintiff claims that Defendant Barrager knew that such misconduct would immediately result in Plaintiff being placed in the Restricted Housing Unit ("RHU"). Id. at ¶56. He alleges that Defendant Barrager was "reassigned from A-Block within 48 hours of filing Plaintiff's DC-141", for "ethic code violations stemming from his unprofessional behavior." Id. at ¶58-60. Plaintiff believes that Defendant Barrager issued him a misconduct because "Barrager knew he was being reassigned within days." Id. at ¶67.

4

Plaintiff alleges that on March 11, 2010, the first time he again saw Defendant Barrager, he "attempted to bump into Plaintiff while Plaintiff was casually standing in the prison corridor outside of commissary as stated in [Plaintiff's] Grievance No. 312179." Id. at ¶71.

Plaintiff claims that on April 25, 2010, while walking to the dining hall, Defendant Barrager "used profanity toward Plaintiff while he was existing [sic] the hospital area." Id. at ¶76. Plaintiff states that he filed a grievance about the events of March 11, 2010 and April 25, 2010. Id. at ¶77. Plaintiff claims that Defendant Barrager is bipolar, has "a history of being anti-inmate," is generally a poor employee, and that he has no respect for his supervisors and disregards their instructions regarding his behavior. Id. at ¶¶ 64, 83, 85.

Plaintiff alleges that Defendant Cirelli was assigned to investigate his claim in Grievance No. 317322, that Defendants Pall and Martin were assigned to investigate Grievance No. 312179, that "C.O. Barrager was literally trying to bump into Plaintiff", and that "instead of properly reprimanding C.O. Barrager, his supervisor Capt. Cirelli retaliated against Plaintiff for filing grievance no. 312322" by issuing "DC-141 no. A725218 alleg[ing] Plaintiff told C.O. Barrager 'I'm going to kill you'" and then "placed Plaintiff in the RHU by alleging Plaintiff lied, however the DVD tape shows Plaintiff was not lying." Id. at ¶¶ 87-91.

With respect to Grievance No. 312179, Plaintiff contends that "Captain Pall, in his attempt to protect C.O. Barrager, erroneously stated Plaintiff 'withdrew' grievance no. 312179 on a request slip to him", however, he claims that Superintendent Walsh remanded Grievance No. 312179, stating "I read offender Keeling's request slip dated, March 30, 2010 and nowhere does it state he is withdrawing grievance no. 312179, therefore it needs to be processed." Id. at ¶¶ 92-93. Plaintiff believes that Defendant Pall "should have suspended C.O. Barrager based on the DVD tape

5

evidence of March 11, 2010", however, "Captain Pall and Lt. Martin ignored C.O. Barrager's conduct/history because staff loyalty supersedes staff intergrity (sic) in the case at bar." Id. at ¶ 85.

Plaintiff states that on March 24, 2010, at Superintendent Walsh's request, he was "called to Major Zakarauskas' office regarding the March 11, 2010 event with C.O. Barrager." Id. at ¶¶ 98-99. Plaintiff believes that the interview was "more scrutinizing of [him] than its propose [sic] to get the facts on [his] problem." Id. at ¶ 101. He claims that "because of the overwhelming evidence and request slips for adequate supervision of this renegade officer, Supervisors Zakarauskas, Pall, Cirelli and Lt. Martin decided to retaliate against plaintiff instead of reprimanding their renegade officer with a poor conduct record." Id. at ¶ 102.

Plaintiff alleges that on June 1, 2010, "the same day grievance no. 317179 was completed", Captain Cirelli placed him in the RHU pursuant to DC-141 No. B079969 for lying to employee, even though, allegedly, "the DVD tape supported Plaintiff's version." Id. at ¶¶ 105-114. Plaintiff claims that "if Captain Cirelli felt plaintiff was lying he should have placed plaintiff in the RHU within (24) hours of the March 23, 2010 interview, not June 1, 2010." Id. He alleges that "because grievance no. 317179 was remanded and plaintiff refused to sign off, it was Major Zakarauskas, Captain Pall, Captain Cirelli whom retaliated on June 1, 2010 by placing plaintiff in the RHU on June 1, 2010, the identical day grievance no. 317179 was completed." Id. at 105. He claims that because "Grievance No. 317179 blamed Captain Pall, Major Zakarauskas and Lt. Martin for lack of supervision of C.O. Barrager, they all decided to retaliate." Id. at ¶ 115. He believes that Defendant Barrager "retaliated against [him] for his history of filing grievances." Id. at ¶ 116.

**B.    Claims against Defendant McKeown**

Plaintiff alleges that on January 28, 2010, Defendant McKeown violated his due process

6

rights with respect to the misconduct charges issued by Defendant Barrager, by refusing to delay the misconduct proceedings and finding Plaintiff guilty, even though Defendant Barrager lacks credibility and was allegedly disciplined for unprofessional conduct. Id. at ¶¶ 181, 187, 189.

With respect to the misconduct issued by Defendants Martin and Pall, Plaintiff alleges that Defendant McKeown violated his rights by not rejecting the misconduct charges on timeliness grounds, imposing an excessive sanction, and generally displaying partiality to staff members. Id. at ¶¶ 177, 186. He also claims that McKeown retaliated against him by failing to interpret the video footage in a way that supported Plaintiff's claim. Id.

### C.   Claims against Defendants Walsh and Wetzel

Plaintiff states that on April 12, 2010, Defendant Walsh "intentionally misused tax payer's funds by transferring at least 133 inmates to the State of Virginia prison system due to the state overcrowding but he permitted his unit managers to continue preferential treatment of at least one fifty hundred non-Z-coded inmates (A-Code) at SCI-Dallas whom single cells should have been revoked which is/was a misuse of Tax payer funds." Id. at ¶ 47. He claims that even with the current bed space crisis, "Superintendent Walsh is currently permitting preferential single cell (A-Coded) with not a trace of mental health case issues over plaintiff." Id. at ¶ 50.

Plaintiff alleges that "on February 22, 2012, [he] filed Grievance No. 402481 requesting to be placed back on the mental health care PRT roster by psychological staff and the grievance was denied by SCI-Dallas administration level (Warden Walsh) on March 26, 2012, causing intentional infliction of mental stress." Id. at ¶ 33. He further alleges that Defendant Walsh, along with Defendant Wetzel, deprived him of "his medical single cell status in order to continue 'preferential treatment' of non-Z-coded inmates in single cells throughout SCI-Dallas as stated in

7

correspondence to Wetzel dated March 11, 2012 and administrative grievance no. 402481." Id. at ¶ 44.[2] Plaintiff believes that "Superintendent Walsh, knew or should know according to DOC policy during time of bed space crisis, he shall first revoke all inmate's from their non-Z-coded single cell status throughout his facility." Id. at ¶ 45.

Finally, with respect to the numerous grievances filed against Defendant Barrager, Plaintiff alleges that Defendant Walsh failed to instruct his staff to interview particular inmates in connection with the allegations made against Defendant Barrager as part of the investigation. Id. at ¶ 117.

### D.   Claims against Defendant Cicerchia

Plaintiff alleges that "it is standard DOC policy and procedure throughout the DOC, for upon completion of RHU sanctions to return the inmate to his original place of housing prior to the entering of the RHU." Id. at ¶ 129. He states that "Unit Manager Cicerchia, in retaliation for being able to observe and expose her preferential treatment in Civil Action No. 09-0147 to inmate's [sic] with non-Z-coded single cell assignments, she (1) stopped plaintiff's release on March 1, 2010 for one additional day to March 2, 2010, (2) so she could re-assign plaintiff to J/Block on March 2, 2010." Id. at ¶ 130. Plaintiff filed Grievance No. 313008 "concerning the wanton retaliation of not permitting plaintiff to return to A/Block on March 1, 2010", claiming that "Ms. Cicerchia w[as]

---

2 .    Notably, Defendant Wetzel was not named in the original complaint and the allegations against him arise from conduct occurring after Plaintiff's motion to file an amended complaint was submitted. See (Doc. 18); (Doc. 23, ¶¶ 33, 44, 45). This Court's Order granting Plaintiff leave to file an amended complaint stated that "to permit the filing of a supplemental complaint containing facts and allegations which are not directly related to the original claims would be prejudicial and cause undue delay." (Doc. 22, p. 5). Nevertheless, these claims will be dismissed on their merits for the reasons discussed below.

unable to give a genuine penological interest for refusing to re-accept plaintiff on A/Block." Id. at ¶ 134.

### E.    Claims against Defendants Martin, Pall, Zakarauskas and Cirelli

Plaintiff generally alleges that Defendants Martin, Pall, Zakarauskas, and Cirelli retaliated against him in connection with the grievances he filed against Defendant Barrager alleging mistreatment and assault. Plaintiff contends that these Defendants failed to conduct interviews with inmate witnesses during their investigation of Defendant Barrager. Id. at ¶73. With regard to Defendant Cirelli, Plaintiff alleges that in retaliation or the filing of grievance No. 312322, Defendant Cirelli placed him in the RHU for lying. Id. at ¶88. With regard to Defendants Pall and Martin, Plaintiff claims that during the course of their investigation they called him to their office on March 30, 2010 to view a video tape which allegedly showed Defendant Barrager purposefully bumping into Plaintiff. Id. at ¶¶151.89-90. He alleges that Defendants Pall and Martin refused to view every angle of that video for the express purpose of concealing Defendant Barrager's guilt. Id. at ¶90. Plaintiff next contends that Defendant Pall subsequently falsified Plaintiff's withdrawal of his grievance. Id. at ¶92.

With regard to Defendant Zakarauskas, Plaintiff alleges that during an interview on March 24, 2010, Defendant Zakarauskas attempted to intimidate him, and that the interview improperly focused on Plaintiff's behavior rather than Defendant Barrager. See Id. at ¶¶ 99-100. He alleges that Defendants Zakarauskas, Pall, and Cirelli retaliated against him on June 1, 2010 by placing him in the RHU. Id. at ¶¶ 105, 116.

### F.    Claims Against Defendant Mooney

Plaintiff claims that he "sent numerous request slip's [sic] concerning C.O. Barrager's

retaliatory behavior to the Deputy Superintendent of Facility Management Mooney and one specifically dated March 14, 2010 concerning the officer's unwarranted inquiries to other inmate's [sic] in the hospital area and Deputy Mooney ignored it." Id. at ¶ 118.

He further alleges that on August 12, 2011, Defendant Mooney summoned Plaintiff to his office where he proceeded to explicitly discourage him from continuing to file grievances. Id. at ¶¶ 209-211. Plaintiff states that he was "forced to file a state T.R.O. petition against Defendant Mooney whom is known for disrespecting inmate's and personally placing them in the RHU simply because he has the power to do so." Id. at ¶ 211.

### G.    Claims Against Defendant Lucas

Plaintiff states that "as the Superintendent's Assistance Coordinator it is Mrs. Robin Lucas whom inmates must first initiate the process to receive authorization for excessive legal material while confined in the RHU at SCI-Dallas and then Mrs. Lucas informs the Warden." Id. at ¶ 154. Plaintiff claims that after entering the RHU on January 28, 2010, he submitted "three (3) request slips to Mrs. Lucas, seeking such authorization, dated 1/29/10, 2/5/10 and 2/9/2010"; however, she ignored his requests slips seeking such authorization. Id. at ¶¶ 154, 164. He alleges that Defendant Lucas' failure to promptly authorize his possession of excess legal materials caused him to suffer an adverse action in several cases. See Id. at ¶¶ 174-176.

## III.    Discussion

### A.    Keeling Has No Constitutional Right to a Specific Cell Assignment

At the outset, it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Accordingly, inmates do not

have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id. Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979) (discussing transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969) (considering transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir. 1976).

    These principles apply with particular force to claims of state prisoners, like those made by Keeling, seeking entitlement to single-cell Z-code status. Such claims have been consistently rebuffed by the courts, which hold that inmates have no constitutional right to this special housing status. See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010) (denying inmate Z-Code cell transfer retaliation claim); Messner v. Bunner, 2009 WL 1406986 (W.D. Pa. 2009) (denying the inmate's preliminary injunction in the form of Z-code cell status); Brown v. Sobina, 2008 WL 4500482 (W.D. Pa. 2008) (denying the inmate's preliminary injunction); Emile v. SCI-Pittsburgh, 2006 WL 2773261, *6 (W.D. Pa. 2006) (denying inmate preliminary injunction in the form of

11

Z-code cell status). Therefore, to the extent Keeling attempts to premise his claims in this case on some constitutional right to a particular housing arrangement, those claims plainly fail to state a cause of action upon which relief can be granted. As such, Plaintiff's claim that Defendants Walsh, along with Defendant Wetzel, deprived Plaintiff of "his medical single cell status in order to continue 'preferential treatment' of non-Z-coded inmates in single cells throughout SCI-Dallas" is without merit and his complaint against these Defendants will be dismissed.

**B.**     **Keeling Has Not Stated a Viable Inmate Retaliation Claim against Defendant Cicerchia**

Plaintiff alleges that after he was released from the RHU, he was not allowed to return to his previous cellblock, A-Block, but was instead sent to J-Block. See (Doc. 23, ¶ 129). Plaintiff blames Defendant Cicerchia for this transfer, which he claims was in retaliation for his "expos[ing] her preferential treatment in a Civil Action No. 09-0147 to inmate's with non-Z-coded single cell assignments." Id. at ¶ 130. Plaintiff alleges that Defendant Cicerchia purposely delayed his release from the RHU for one day so that he could not return back to A-Block and could be reassigned to J-Block. Id. at ¶¶ 130, 131.

Recognizing the fact that he is not entitled to a particular transfer or housing status, Keeling has cloaked his constitutional claims as a cause of action against prison officials based upon an allegedly retaliatory transfer within the prison, a transfer that occurred more than a year after Keeling filed an unsuccessful federal lawsuit. Inmates like Keeling frequently invite courts to infer retaliatory motives to cell assignments and other prison policies. Yet, these invitations, while frequently made, are rarely embraced by the courts. Compare DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010) (denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Alexander v. Fitch, 2010 WL 1257709 (W.D. Pa. 2010) (same); Carpenter v.

12

Kloptoski, 2010 WL 891825 (M.D. Pa. 2010) (same); Solan v. Ranck, 2007 WL 141918 (M.D. Pa.

2007) (denying retaliation claim, in part); with Curtician v. Kessler, 2009 WL 2448106 (W.D. Pa.

2009) (finding factual issues preclude dismissal of inmate cell transfer retaliation claim).

Rather, a prisoner claiming that prison officials have retaliated against him for exercising

his constitutional rights must first prove the following three elements: (1) the conduct in which he

engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison

officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the

defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the

obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he

suffered action that "was sufficient to deter a person of ordinary firmness from exercising his

rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Examples of adverse actions that

have, in certain cases, been found to support a retaliation claim include filing false misconduct

reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another

prison, Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in

administrative custody, Allah, 229 F.3d at 225.

The third essential element to a retaliation claim is that there be a causal link between the

exercise of a constitutional right and the adverse action taken against the prisoner. Rauser, 241

F.3d at 333-34. To establish this third, and crucial, component to a constitutional retaliation claim,

causation, Keeling must make an exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1)
> an unusually suggestive temporal proximity between the protected activity and the
> allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to
> establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04
> (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997).
> In the absence of that proof the plaintiff must show that from the "evidence gleaned

13

from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). Moreover, when examining these causation issues, the Court of Appeals specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and the allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

> To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr.13, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate

14

of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); see also Kachmar v.
Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that "temporal
proximity merely provides an evidentiary basis from which an inference can be
drawn"). For temporal proximity alone to establish causation, the "timing of the
alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before
a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am.
Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)) . . .[T]he Third Circuit Court of
Appeals has suggested that a temporal proximity of two days is sufficient to
establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5
(3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish
causation only when accompanied by other evidence of . . . wrongdoing,
Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). This
suggests that the temporal proximity must be measured in days, rather than in weeks
or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., 2009 WL 1227950, *3 (M.D. Pa. 2009) (Conner, J.) (dismissing the

retaliation claim because two months temporal proximity was insufficient).

Applying this standard, courts in civil rights cases have frequently rebuffed speculative

efforts to infer causation from temporal proximity when a span of weeks, months, or years

separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of

retaliation.

Our sister courts have held that a temporal proximity of as little as seventeen days
was insufficient to establish causation. See Killen v. N.W. Human Servs., Inc., No.
06-4100, 2007 U.S. Dist. LEXIS 66602, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7,
2007) (holding that temporal proximity of seventeen days was insufficient to
establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal
proximity of seven weeks would be insufficient to establish causation); Smith v.
ABF Freight Sys., Inc., No. 04-2231, 2007 U.S. Dist. LEXIS 79801, 2007 WL
3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one
and one-half months was insufficient to establish causation); Mar v. City of
McKeesport, No. 05-19, 2007 U.S. Dist. LEXIS 69563, 2007 WL 2769718, at *4
(W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was
insufficient to establish causation).

Fischer v. Transue, 04-2756, 2008 WL 3981521, *10 (M.D. Pa. Aug. 22, 2008) (holding that

temporal proximity of three weeks was insufficient to establish causation). Accordingly, courts

15

have often rejected retaliation claims as legally insufficient when those claims are like the retaliation assertion made here, an assertion of retaliation based solely on circumstantial proof of some temporal link between the plaintiff's conduct and the defendants' actions when the evidence shows that these events are separated by a significant temporal gulf. See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010) (denying inmate cell transfer retaliation claim as two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F. App'x, 167 (3d Cir. 2008) (finding, in an employment discrimination-retaliation case, four months temporal proximity insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient); Conklin v. Warrington Tp., 2009 WL 1227950 (M.D. Pa. 2009) (2-month temporal proximity insufficient); Rogers v. Delaware, Dept. of Public Safety/DMV, 541 F.Supp.2d 623, 627 (D.Del. 2008) (10-month period insufficient);Brown v. Boeing, 468 F.Supp.2d 729 (E.D. Pa. 2007) (3-4 months insufficient); Lumban-Tobing v. Potter, 2005 WL 2100691 (M.D. Pa. 2005) (finding 9-months insufficient temporal proximity, but other proof created factual issue precluding summary judgment).

Finally, if a plaintiff discharges his obligation to satisfy this three-part prima facie test, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she would have made the same decision absent the protected conduct for reasons reasonably related to penological interest. Carter, 292 F.3d at 158. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same

decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

With all these considerations in mind, this Court finds that Plaintiff fails to satisfy the adverse action element of his retaliation claim because the transfer of an inmate from one cellblock to another is insufficient to deter a person of ordinary firmness from exercising his constitutional rights. Plaintiff does not allege any facts from which it can be inferred that life on J-Block is any different from or less agreeable than life on A-Block. Further, "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." McKune v. Lile, 536 U.S. 24, 39 (2002); see also 37 Pa. Code § 93.11(a) ("An inmate does not have a right to be housed in a particular facility or in a particular area within a facility").

Additionally, this case aptly illustrates the limitations which the law imposes upon those like Keeling who wish to tie disparate events together into a seamless web of retaliation. Recognizing that the court "must be diligent in enforcing these causation requirements" of a retaliation claim, see Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267-68 (3d Cir. 2007), the allegations set forth in Plaintiff's complaint simply do not permit any inference of a causal relationship between the events described. The causal inference Plaintiff wishes to draw fails because his constitutionally protected litigation activity was remote in time and place from the cell assignment which lies at the heart of this lawsuit. He filed his prior lawsuit, naming Defendant Cicerchia, on January 23, 2009. The cell assignment decision that Plaintiff complains of occurred in March 2010, more than one year after he filed his civil action. Because the United States Court of Appeals for the Third Circuit has held in the context of an inmate retaliation claim based upon the denial of Z-Code status that a temporal proximity of several months is inadequate to support an

inference of causation, see DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010) (denying inmate Z-code cell transfer retaliation claim, two months temporal proximity insufficient), it follows that a year's time between these events is far too remote to support such a retaliation claim.

Therefore, Plaintiff's challenge to his transfer to J-Block fails as a matter of law and Defendant Cicerchia will be dismissed.

**C.**  **Plaintiff fails to state a claim for retaliation arising out of a misconduct charge received for lying in a grievance.**

Plaintiff claims that he was issued a retaliatory misconduct charge for lying on a grievance. See (Doc. 23, ¶ 88). The grievance claimed that on March 11, 2010, Defendant Barrager tried to bump into him. Id. Plaintiff claims that although the video evidence showed he was not lying, Defendants Pall, Martin, and Cirelli did not believe that the video evidence supported his version of events. Id. at ¶¶ 88, 90. He also alleges that Defendant Zakarauskas' interview regarding the incident was more scrutinizing of Plaintiff than an attempt to get at the facts. Id. at ¶¶ 98-101. Plaintiff alleges that sometime after Defendants Pall and Martin expressed their skepticism about the claims in his grievance, they issued him a misconduct charge, for which he was ultimately sent to the RHU. Id. at ¶105. He concludes that Defendants Pall, Martin, Cirelli, and Zakarauskas decided to retaliate against him for filing various grievances, instead of reprimanding Defendant Barrenger. Id. at ¶ 102. Further, Plaintiff claims that Defendant McKeown's interpretation of the video footage and the disciplinary sanction she ultimately imposed was retaliatory due to Plaintiff's history of filing grievances. See (Doc. 23, ¶¶ 88, 102, 105, 115-116, 186).

Aside from the bald claim that the Corrections Defendants' actions were retaliatory, Plaintiff offers no facts to support his claim that the misconduct was retaliatory. Even assuming arguendo that Plaintiff has shown that he was engaged in constitutionally protected conduct and

18

that the Corrections Defendants subjected him to a sufficiently adverse action, he cannot establish the causation element of a retaliation claim. In establishing those elements of a retaliation claim, a plaintiff must produce more than "general attacks" upon the defendant's motivations. A plaintiff must produce "affirmative evidence" of retaliation from which a jury could find that he carried his burden of proving the requisite motive. See Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted). Because many inmates have a tendency to raise retaliation claims when they are confronted with disciplinary action, courts must examine prisoners' retaliation claims skeptically to avoid becoming entangled in every disciplinary action taken against an inmate. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996).

Moreover, "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. Where there is a finding of guilt, an inmate fails to meet prong three of the Rauser test. Romansky v. Stickman, 147 Fed. Appx. 310 (3d Cir. 2005), citing Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (explaining that a finding that the inmate actually committed the misconduct "essentially checkmates his retaliation claim"), cert. denied, 515 U.S. 1145 (1995). Retaliatory discipline claims fail when there is "some evidence" supporting a guilty finding for the charges. Nifas v. Beard, 374 Fed. Appx. 241 (3d Cir. 2010).

Plaintiff was found guilty of the misconduct charge at issue. (Doc. 14, Ex. C, Official Inmate Grievance Initial Review Response). In fact, the Grievance Coordinator found that Plaintiff's Grievance No. 317322, filed on April 30, 2010, after the date the alleged "bogus

misconduct" was issued by Defendant Barrager, to be "retaliatory in nature due to Officer Barrager

issuing [Plaintiff] a misconduct report for threatening an employee on 1/28/2010, in which Plaintiff

was found guilty and received 30 days disciplinary custody." Id. Thus, this finding of guilt meets

the Corrections Defendants' burden to show that the misconduct charges were brought due to

legitimate penological reasons, and not due to retaliatory animus.  Consequently, Plaintiff's

retaliation claim against Defendants Barrager, Pall, Martin, and Cirelli will be dismissed.

To the extent that Defendant Cirelli is sued in his capacity as Grievance Coordinator for

denying Plaintiff's Grievance No. 317322, and Corrections Defendant Walsh is sued for upholding

the denial on appeal, dissatisfaction with the response to an inmate's grievances does not support a

constitutional claim.  See Alexander v. Gennarini, 144 Fed. Appx. 924 (3d Cir. 2005) (stating that

involvement in post-incident grievance process is not a basis for §1983 liability); Pryor-El v. Kelly,

892 F.Supp. 261, 275 (D.D.C. 1995) (concluding that because prison grievance procedure does not

confer any substantive constitutional rights upon prison inmates, the prison officials' failure to

comply with grievance procedure is not actionable). See also Cole v. Sobina, 2007 WL 4460617,

*5 (W.D. Pa. 2007) ("[M]ere concurrence in a prison administrative appeal process does not

implicate a constitutional concern.").  The "failure of a prison official to provide a favorable

response to an inmate grievance is not a federal constitutional violation." Flanagan v. Shively, 783

F.Supp. 922, 931–32 (M.D. Pa. 1992), aff'd, 980 F.2d 722 (3d Cir. 1992).

**D.**     **Plaintiff fails to state a claim for a violation of his rights of access to the courts.**

Plaintiff believes that Defendant Barrager's issuance of Misconduct No. 725218, in which

Plaintiff was found guilty on January 28, 2010, and sanctioned to thirty (30) days in the RHU,

where Defendants Lucas and Walsh refused to permit him to possess excess legal property, has

20

resulted in a denial of access to the courts, in that Plaintiff was unable to file important pleadings in several of his cases. See (Doc. 23, ¶¶ 174-176).

Prison inmates have a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 821 (1977). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828. In Lewis v. Casey, 518 U.S. 343 (1996), the Court clarified that "[t]he tools [Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." 518 U.S. at 355.

In order to sustain a claim for denial of the right of access to the courts based on an inadequate law library, an inmate must allege an "actual injury" to his litigation efforts. Id. at 349; see also O'Connell v. Williams, 241 Fed. Appx. 55, 57 (3d Cir. 2007). To establish actual injury, an inmate plaintiff must demonstrate that a non-frivolous legal claim had been frustrated or was being impeded. Id. In other words, "an inmate cannot establish a relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Lewis, 518 U.S. at 351. This pleading requirement of actual injury stems "from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches ... It is the role of courts to provide relief to claimants ... who have suffered, or will imminently suffer, actual harm ...." Id. at 349.

In Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court held that in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint: 1) a non-frivolous, underlying claim; 2) the official acts frustrating the litigation; and 3)

21

a remedy that may be awarded as recompense that is not otherwise available in a future action. <u>Christopher</u>, 536 U.S. at 415. Accordingly, in order to be successful on a right of access to the courts claim, a plaintiff must plead that he lost an opportunity to file a case in court and that he could not subsequently file that case after the interference with the right of access to the court ceased. <u>Id</u>. The Supreme Court in <u>Christopher</u> observed that the "very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong .... the right [of access to the courts claim] is ancillary to the underlying claim, without which the plaintiff cannot have suffered injury by being shut out of court." <u>Id</u>. at 414–15.

Specifically, Plaintiff states that on "2/4/10 the Superior Court denied Plaintiff's criminal appeal No. 1266 EDA 2009 giving Plaintiff (14) days to file reargument." (Doc. 23, ¶167). Plaintiff claims that on February 5, 2010, he filed a "Letter Motion" with the Superior Court "seeking additional time to file a petition for reargument." <u>Id</u>. at ¶170. Plaintiff alleges that Defendants Lucas and Walsh "were prior to 1/29/10 aware Plaintiff had the following pending legal matters, <u>Keeling v. Damiter</u>, No. 09-0147, Second Circuit Court of Appeals <u>Keeling v. Klopotoski</u>, No. 09-5690 and <u>Keeling v. Commonwealth</u>, No. 1266 EDA 2009 and it was/is impossible to respond to those pending legal matter's with <u>one</u> record box of written material." <u>Id</u>. at ¶174 (emphasis in original).

In the instant case, Keeling has not stated a claim upon which relief may be granted because he has not alleged an actual injury to his litigation efforts that has resulted in his being shut out of court. In particular, although he claims that he was deprived of materials necessary to respond to legal matters, he does not allege that these alleged inadequacies resulted in the loss of opportunity

to litigate his pending cases.  In fact, Plaintiff, himself, indicates that he was able to request an

enlargement of time from the Pennsylvania Superior Court with respect to filing his motion for

reargument.  Additionally, the Court takes judicial notice of <u>Keeling v. Damiter</u>, Civil No. 09-

0147, which was decided on the merits, with no indication that Plaintiff was prejudiced in any way

for failing to meet any court deadlines.  In fact, the Court notes that on February 18, 2010, Plaintiff

filed a sixteen (16) page Response to Defendant's objection to the Magistrate Judge's Report and

Recommendation, supported by six (6) pages of exhibits.  See <u>Keeling v. Damiter</u>, Civil No. 09-

0147 (M.D. Pa. 2009) at (Doc. 67).

Likewise, with respect to <u>Keeling v. Klopotoski</u>, No. 09-5690, this case proceeded to final

disposition, with no indication that Plaintiff was prejudiced in any way for failing to meet any court

deadlines.  On February 24, 2010, Plaintiff filed a motion to file a successive petition within the

action.  See <u>Keeling v. Klopotoski</u>, No. 09-5690 (2nd Cir. 2010) at (Doc. 6).

Consequently, he cannot plead the essential element of actual injury necessary to sustain an

access to the courts claim and no amendment to his complaint would allow him to do so.

Accordingly, Plaintiff's access to the courts claim and Defendant Lucas will be dismissed.

**E.    Plaintiff fails to state a Due Process violation.**

Plaintiff states that he received "DC-141 report No. B079963 on June 1, 2010 and DC-141

report No. B077969 on June 16, 2010." (Doc. 23, ¶ 180).  He claims that he was "placed in the

RHU pursuant to DC-141 No. B079963 on June 1, 2010", and that his "administrative custody

proceeding was completed outside of the 15 calendar days" for DC-141 report No. B079969, which

was dated June 16, 2010.  Id. at ¶¶ 177-179.  Plaintiff alleges that he "immediately requested

dismissal of all charges [for Report No. B079969], since (1) the defendants did not get an

23

extenstion of time, (2) served Plaintiff with the DC-141 report on June 16, 2010" and "hearing examiner, C.J. McKeown knowingly and willingly violated A.C. custody procedures by imposing a sanction of (90) days DC-time on June 18, 2010." Id. at ¶¶ 181-182. Additionally, he believes that the misconducts he received rested on dubious factual grounds, and the process was flawed throughout his disciplinary proceedings with respect to the timeliness of receiving the misconducts, the hearing examiner's interpretation of the evidence, and the RHU sanction received. See (Doc. 23, ¶¶ 177, 181, 186-187, 189).

The filing of a false misconduct report does not violate an inmate's due process rights. The general rule, as stated in Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), provides that a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The Plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law." Thus, where a prisoner is provided due process, no constitutional violation results from his being falsely accused of a misconduct.

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall. . .deprive any person of life, liberty, or property, without due process of law. . . ." The Supreme Court has mandated a two-part analysis of a procedural due process claim: first "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property[,]'" and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law'." Ingraham v. Wright, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred.

24

In Wolff v. McDonnell, 418 U.S. 539, 563-73 (1974), where the plaintiffs were deprived of good time credits as a severe sanction for serious misconduct, the Supreme Court held that such inmates had various procedural due process protections in a prison disciplinary proceeding, including the right to call witnesses and to appear before an impartial decision-maker.[3] Thereafter, the Court in Hewitt v. Helms, 459 U.S. 460, 471 (1983), stated that a state law which "used language of an unmistakably mandatory character" creates a protected liberty interest. Following Hewitt, many courts held that a state regulation can create a due process interest -- such as freedom from punitive segregation -- if the rule contains mandatory language such as "shall" or "will." E.g., Layton v. Beyer, 953 F.2d 839, 848-49 (3d Cir. 1992).

The Court's decision in Sandin v. Conner, 515 U.S. 472 (1995), however, marked a shift in the focus of liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. Id. at 481. In Sandin, the Court was presented with the procedural due process claims of a state prisoner who had been found guilty of misconduct and sentenced to thirty (30) days in disciplinary segregation. Id. at 474-76. The Court

---

3.    In Wolff, the Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Id. at 556. Nonetheless, the Supreme Court held that a prisoner facing serious institutional sanctions is entitled to some procedural protection before penalties can be imposed. Id. at 563-71. The Supreme Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative, if the charged inmate is illiterate or if complex issues are involved; (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. Id. An additional procedural requirement was set forth in Superintendent, Massachusetts Correctional Inst. at Walpole v. Hill, 472 U.S. 445, 453-56 (1985). In that case, the Court held that there must be some evidence which supports the conclusion of the disciplinary tribunal.